UNITED STATES DISTRICT COURT
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| JEROME BROUSSARD, | * CIVIL ACTION |
| | * |
| Plaintiff | * NO. |
| v. | * |
| | * SECTION |
| | * |
| LOYOLA UNIVERSITY, LOYOLA | * |
| UNIVERSITY BOARD OF TRUSTEES, | * |
| TRUSTEE CHAIR ROBERT SAVOIE, | * COMPLAINT AND |
| Individually and as agent for LOYOLA | * JURY TRIAL DEMAND |
| UNIVERSITY, MARY ALGERO, | * |
| individually and as agent for LOYOLA | * |
| UNIVERSITY, ROBERT REED, | * |
| individually and as agent for LOYOLA | * |
| UNIVERSITY, NIKOLINA CAMAJ, | * |
| individually and as agent for LOYOLA | * |
| UNIVERSITY and ALEXANDRIA | * |
| KELCH-BRICKNER, individually and as | * |
| agent for LOYOLA UNIVERSITY, | * |
| | * |
| Defendants | * |

## **COMPLAINT**

Plaintiff JEROME BROUSSARD, by his attorney Jeffery Speer, as and for his Complaint,

respectfully alleges as follows:

## **THE NATURE OF THIS ACTION**

1. This case arises out of the actions taken and procedures employed by Defendants

1

Loyola University (the "University"), Robert Savoie, ("Defendant Savoie"), Mary Alegro ("Defendant Alegro"), Robert Reed ("Defendant Reed"), Alexandria Kelch-Brickner ("Defendant Kelch-Brickner") and Nikolina Camaj ("Defendant Camaj") concerning allegations made against Plaintiff, a male 2L Law student at Loyola, as a result of false allegations of non consensual sexual contact with a non-student civilian who Jerome Broussard had broken off a relationship with several months earlier.

2.     In addition to the damages sustained by Jerome Broussard, including his inability to continue his education at Loyola and a permanent notation of a finding of sexual assault on his educational records, Jerome Broussard has sustained tremendous damages to his future education and career prospects as a result of the University finding Jerome Broussard responsible for an offense he did not commit resulting in his suspension from the University. Due to the erroneous outcome and resulting sanction of suspension, Jerome Broussard lost $90,000 in tuition monies he had paid to the University. Throughout the investigative process, Defendants failed to abide by University's own guidelines and regulations and acted in direct violation of federal and/or state law.

3.     A non-exhaustive list of Defendants' wrongful actions include the following: (i) Defendants failed to conduct a thorough and impartial investigation; (ii) Defendants failed to provide Jerome Broussard proper notice of the charges; (iii) Defendants evidenced a gender bias against Jerome Broussard as the male accused of sexual misconduct throughout the investigative process; (iv) Defendants failed to conduct a timely investigation and adjudication

process; (v) Defendants made assessments of credibility and evidentiary weight with respect to each party and witness without any ascertainable rationale or logic; (vi) Defendants failed to consider new material evidence presented by Jerome Broussard; (vii) Defendants failed to provide Jerome Broussard with necessary information prior to his hearing; (viii) Defendants failed to provide Jerome Broussard with a rationale for their decision; and (ix) Defendants failed to afford Jerome Broussard the requisite presumption of innocence required by a preponderance of the evidence standard, all of which demonstrated substantial procedural errors in violation of Title IX, the Fourteenth Amendment and other federal and/or state laws.

4.     When Defendants subjected Jerome Broussard to disciplinary action, they did so in an arbitrary and capricious way, deprived him of due process and discriminated against him because of his gender. Defendants failed to adhere to Loyola's own guidelines and regulations, and the guidelines and regulations themselves were inherently discriminatory and insufficient to protect the rights of male students. The decision reached was discriminatory; given the evidence (or lack thereof), a discriminatory bias against males and the underlying motive to protect Loyola's reputation and financial well-being was required for a conclusion of sexual misconduct to be reached. Jerome Broussard has been greatly damaged by the actions of Defendants. His education and career prospects have been severely compromised, and the

significant monies spent on obtaining a college education at Loyola have been squandered. Jerome Broussard lost

$90,000 paid in tuition. Additionally, as a result of Defendants' actions and inactions, Jerome Broussard has suffered physical, psychological, emotional and reputational damages, economic injuries and the loss of educational and career opportunities.

5.     Jerome Broussard therefore brings this action to obtain relief based on causes of action for, among other things, violations of Title IX of the Education Amendments of 1972, violation of the 14th Amendment Procedural Due Process, breach of contract and other state law causes of action.

## THE PARTIES

6.     Jerome Broussard is a natural person residing in the State of Louisiana. During the events described herein, Jerome Broussard was a student at Loyola and resided off of the University's campus in New Orleans, LouisianaUpon information and belief, Defendant Loyola University is a private, coeducational university located in New Orleans, Louisiana.

Upon information and belief, Defendant **Savoie,** is a resident of the State of Louisiana and was the Chair of the Loyola Board of Trustees at all relevant times herein.

7.     Upon information and belief, Defendant Alegro is a resident of the State of Louisiana and was the Dean of Law at Loyola at all relevant times herein.

8.     Upon information and belief, Defendant Camaj is a resident of the State of Louisiana and was the Title IX Coordinator at Loyola at all relevant times herein.

4

9.    Upon information and belief, Defendant Reed is a resident of the State of Louisiana and was the Assistant Vice President for Student Affairs at Loyola at all relevant times herein.

10.   Upon information and belief, Defendant Kelch-Brickner is a resident of the State of Louisiana and was the Investigator of the Office of Student Conduct at Loyola at all relevant times herein.

## JURISDICTION AND VENUE

11.   This Court has federal and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343 and 28 U.S.C. § 1367 because: (i) the case arises under the laws of the United States; (ii) the claims brought under Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 et seq., and 42 U.S.C. § 1983 are civil rights claims; and (iii) the state law claims are so closely related to the Title IX and 42 U.S.C. § 1983 federal law claims as to form the same case or controversy under Article III of the U.S. Constitution

12.   This Court has personal jurisdiction over Defendants on the grounds that Defendants are conducting business within the State of Louisiana.

13.   Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**A.    Background: The "April 2011 Dear Colleague Letter" of The Department of Education's Office for Civil Rights.**

14.   On April 4, 2011, the Office of Civil Rights ("OCR") in the Department of Education ("DOE" or "Ed") sent a "Dear Colleague Letter" to colleges and universities (hereinafter referred to as the "April 2011 Dear Colleague Letter"). The "April 2011 Dear Colleague Letter" provides a necessary set of background facts to this action.

15.   The "April 2011 Dear Colleague Letter" advised that, in order to comply with Title IX, colleges and universities must have procedures to promptly investigate and resolve complaints of sexual misconduct. Most notably, the April 2011, "Dear Colleague Letter" required schools to adopt a relatively low burden of proof-"more likely than not" in cases involving sexual misconduct.  Several schools, like Harvard Law School, had been using a "clear and convincing" standard of proof, and some, like Standford University applied the criminal standard "beyond a reasonable doubt."

16.   The "April 2011 Dear Colleague Letter" indicated state schools should "minimize the burden on the complainant, suggesting schools focus more on victim advocacy.  Though Due Process Rights aren't completely ignored, suggestions include giving both parties the right to appeal decisions made, amounting to double jeopardy for the accused student. Subsequent to the publication of the letter and directly as a result of the same, many schools changed their policies / procedures on sexual complaints.

17.   The Obama Administration, through the DOE and OCR, treated the 2011 Dear Colleague Letter as binding on regulated parties for all practical purposes and pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses.

Catherine Lhamon ("Lhamon"), former Assistant Secretary of the DOE in charge of its OCR, delivered the following directives orders to colleges and universities:

(a)  In February 2014, Lhamon told college officials attending a conference at the University of Virginia that schools needed to make "radical" changes. According to the Chronicle of Higher Education, college presidents said afterward that there were "crisp marching orders from Washington." "Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases," Chronicle of Higher Education, February 11, 2014.

(b)  In June 2014, Lhamon testified at a Senate Hearing that "some schools are still failing their students by responding inadequately to sexual assaults on campus. Lhamon further told the Senate Committee, "Th[e] [Obama] Administration is committed to using all its tools to ensure that all schools comply with Title IX . . She also told the Committee: If OCR cannot secure voluntary compliance…. may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school.

(c)  In July 2014, Lhamon, speaking at a conference on campus sexual assault held at Dartmouth College, stated that she was prepared to cut off federal funding  to schools that violate Title IX and that she would strip federal funding from any college found to be non-compliant with the requirements of the Dear Colleague Letter. "Do not think it's an empty threat," Lhamon warned.

". . . It means that so far the process has been working." Meredith Clark, "Official

to colleges: Fix sexual assault or lose funding," July 15, 2014 (available at:

**http://www.msnbc.com/msnbc/campus-sexual-assaultconference-dartmouth-**

college #51832).

(d)   Lhamon was quoted in the *Los Angeles Times* stating, "We don't treat rape and

sexual assault as seriously as we should. [There is] a need to push the country

forward." Savage and Timothy M. Phelps, "How a little-known education office

has forced far- reaching changes to campus sex assault investigations," *Los*

*Angeles Times*, August 17, 2015.

18.   To support making the "April 2011 Dear Colleague Letter" binding, the OCR hired

hundreds of more investigators for Title IX enforcement and has since "conducted 435

investigations of colleges for possibly mishandling reports of sexual violence." according to the

Chronicle of Higher Education Title IX Tracker

19.   The colleges and universities under OCR investigation, as well as those schools

not yet under investigation but which receive federal funding, including Defendant Loyola, are

fearful of being sanctioned by the DOE and/or of potential Title IX lawsuits by the U.S.

Department of Justice ("DOJ"). In April 2014, the White House issued a report entitled "Not

Alone," which included a warning that the DOJ shares authority with OCR for enforcing Title

IX and may initiate an investigation or compliance review of schools which may include litigation

20. To revoke federal funds is a powerful tool because institutions receive billions of dollars a year from the federal government. Quoting Anne Neal of the American Council of Trustees and Alumni "There is a certain hysteria in the air on this topic, . . . It's really a surreal situation, I think……. schools are running so scared of violating the civil rights of alleged victims that they end up violating the  due process rights of defendants instead." "How Campus Sexual Assaults Came To Command New Attention," NPR, August 12, 2014.

21. The DOE and OCR have created a significant amount of pressure on colleges and universities to treat all those accused of sexual misconduct with a presumption of guilt. The Chronicle of Higher Education noted that "Colleges face increasing pressure from survivors and the federal government to improve the campus climate." "Presumed Guilty:
College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014. In the same article, the Chronicle noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent."

9

"Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014.

22.   In response to pressure from OCR, DOJ, and the Obama Administration, Defendant Loyola, have limited the procedural protections afforded to male students, like Jerome Broussard, in sexual misconduct cases.

**B. Jerome Broussard and M.J.  Become Friends and Begin to Engage in Sexual Activity**

23.   Jerome Broussard grew  up in Lafayette, Louisiana. In high school, he was a member of

the Honor Society. He excelled in his studies and had never faced accusations or adjudication of any misconduct, academic or otherwise.

24.   Jerome Broussard applied and was accepted to Loyola as part of the class of 2018. He commenced his education at Loyola in August 2015, at the age of forty-two. Jerome Broussard was a non-traditional student in that he already held several degrees and that he had been in the workforce for approximately nineteen years.

25.   Jerome Broussard was introduced to non-student, M.J., during the first week April 2016. Several days after being introduced, Jerome Broussard was called by M.J. crying, asking if he would come pick her up at the "Boomtown" casino. Jerome Broussard agreed, then drove her to her residence, Once M.J. was securely inside, Jerome Broussard returned home.

26.   On May 14, 2016, Jerome Broussard traveled to Rome, Italy with his law school class.  On the flight over the Atlantic Ocean, M.J. continuously contacted Jerome Broussard

through the phone messaging app "WhatsApp."  During these conversations M.J. sought help with purchasing a new car.  Although Jerome Broussard was not interested in a romantic relationship with M.J., she touched on his emotion by conveying struggles as a single mother, asking for help. Jerome Broussard told M.J. that he would try to help her help herself upon his return to the states.

27.   On May 30, 2016, Jerome Broussard co-signed a new car lease with M.J. on the promise that she would always pay the note timely, not let the note be assessed late fees, and get it refinanced within one year.

28.   Although Jerome Broussard wasn't interested in a committed relationship, M.J. persisted and this friendship evolved into a romantic relationship, including consensual sexual intercourse between M.J. and Jerome Broussard.

29.   Shortly thereafter, M.J. began acting irrational, including becoming intoxicated and causing public disturbances. Jerome Broussard stopped the sexual relations with M.J., but in an effort to avoid inflaming M.J. agreed to remain a platonic friend.

30.   By July 17, 2016 and after multiple acts of hysteria occurred,  Jerome Broussard informed M.J. that he no longer wanted to have any interaction with her.  Thereafter M.J. begins a malicious campaign to get Jerome Broussard to change his mind, including emails to Jerome Broussard promising to make the car payment, along releasing Jerome Broussard from responsibility of the same by personally financing the loan. She also appeared at his home unannounced on several occasions.  Jerome Broussard tried to keep conversations brief and make

11

excuses to leave. This behavior continued unabated and by October 2016, Jerome Broussard began to stay elsewhere to avoid M.J.

31.   Although  M.J. continued to email Jerome Broussard during this time by creating new email addresses that Jerome Broussard hadn't already blocked from entering his email inbox, Jerome Broussard remained cordial but the focus of  his correspondence was related to M.J.'s loan obligation

32.   On December 14, 2016, M.J. called Jerome Broussard at his place of employment crying hysterically about the fact that Jerome Broussard no longer wanted any type of relationship with her.    M.J. stated she couldn't drive and asked Jerome Broussard to sleep off her alcohol intoxication at his residence.  Out of a desire to insure safety for M.J. and the public, Jerome Broussard agreed on the condition that she would leave before he returned at 08:00 a.m.

33.   Jerome Broussard arrived home and though M.J. slept off her intoxication, she refused to leave, crying hysterically.  When Jerome Broussard told M.J. that he would call the police to have her removed from his property, M.J. threatened Jerome Broussard, stating she would claim that he was physically violent with her and have him arrested. Fearful, Jerome Broussard left his home and rented a hotel room in the CBD area of New Orleans to remain distanced from M.J. Based on a year of M.J.'s threats this conduct was videotaped by Jerome Broussard before leaving his home.

34.   M.J. remained at the residence for three (3) days, refusing to leave. Only when Jerome Broussard's landlord and roommate returned home to find M.J. at the house alone and

inquired about the situation did M.J. decide to leave.  Thereafter, out of caution and fear, Jerome Broussard refused all contact with M.J.

35.   On February 6, 2017, M.J. called Jerome Broussard's cellular phone from an unknown number to offer condolences on the death of a close friend of Jerome Broussard.  The conversation quickly turned to M.J.'s requests that they rekindle some type of relationship. When Jerome Broussard informed M.J. that he would not discuss their past relationship or any type of relationship in the future, M.J. proceeded to curse Jerome Broussard, making threats about his employment and enrollment in law school.  While mourning the death of his friend, Jerome Broussard mistakenly did not take M.J.'s threats seriously and he hung up on the phone.

## C.   Jerome Broussard Is Informed Of M.J.'s Allegations Against Him Almost Three Months After M.J. Files Her Complaint

36. Upon information and belief, on or about February 13, 2017, M.J. made a report to Alexandri Kelch-Brickner, a Title IX Investigator with Loyola Office of Student Conduct alleging that Jerome Broussard had engaged in nonconsensual sexual activity with her on October 16, 2016 and had stalked M.J. since that date.

37.   Upon information and belief, on or about March 10, 2017, Defendant Camaj submitted an Incident Report on behalf of M.J..

38.   Upon information and belief, on March 10, 2017, M.J. met with Robert Reed, Assistant Vice President for Student Affairs, and repeated her allegations. Upon information and

13

belief, M.J. requested a No-Contact Order be issued between herself and Jerome Broussard. M.J. further requested to meet with Robert Reed, Director of the Office of Student Conduct, in order to gain information regarding the conduct process.

39.   Upon information and belief, Defendant Camaj met with M.J. to take her statement on or about March 14, 2017.

40.   On or about March 21, 2017, Jerome Broussard emailed Defendant Reed to inquire about whether he would be able to attend summer classes in Vienna with the exchange law school located in Wein, Austria.

41.   March 22, 2017, a local police detective along with a SWAT team entered Jerome''s home.  He was given a copy of a search warrant for electronic storage devices which may contain evidence of a sexual assault against M.J.

42.   Jerome Broussard informed the detective that only electronic files he had of M.J. were stored in the "cloud."  that the files were video recordings of his asking M.J. to leave his home and her refusal to do so.  Jerome Broussard accessed, the cloud and allowed the police viewing of the recordings, none of which showed any alleged crime.

43.   Jerome Broussard waived his "Miranda Rights" and he explained to the detective that he had broken off the relationship with M.J. over eight months previous and described the events which transpired. He also explained that the instant complaint was falsified.   After

reading emails between M.J. and Jerome Broussard, and viewing the aforesaid videos, the detective declined to arrest Jerome Broussard on the charge of rape.

44.   On or about March 23, 2017, Defendant Reed answered the March 21st email from Jerome Broussard and asked to set up a time to meet and discuss class travel to Vienna per Jerome's request.

45.   Jerome Broussard met with Defendant Reed at the Dana Center located on Loyola's campus on March 27, 2017.  Defendant Reed informed Jerome Broussard that because he was currently on probation he would not qualify for the travel to Vienna over the summer.  He also informed Jerome that there was another complaint filed against him by someone.  Jerome Broussard informed Defendant Reed about M.J.'s alleged criminal complaint, that a cursory investigation by police found it baseless and malicious in nature. Jerome was adamant that there was no truth in the complaint made by M.J. both criminally and academically.

46.   After an exhaustive investigation related to the aforesaid criminal complaint, the District Attorney, also refused all charges against Jerome Broussard.

47.   Upon information and belief, Alexandria Kelch-Brickner provided M.J. with on and off- campus support resources and offered to set up a meeting between M.J. and the Office of Student Conduct ("OSC") to discuss possible participation in the conduct process.

48.   Jerome Broussard received an email from Defendant Reed on May 7, 2017, asking to meet with Jerome Broussard. Defendant Reed informed Jerome Broussard that M.J. had requested a "No Contact Order' against Jerome Broussard.  Jerome again informed Defendant

Reed that there was no basis for the complaint, but he had no intention of having contact with M.J and, concluded it was the end of the matter.

49.  It was not until one week later, on or about May 15, 2017, that Jerome Broussard was given the opportunity to speak with anyone, from Loyola regarding further allegations made by M.J.  When Jerome Broussard received the prior email from Defendant Reed, requiring him to attend a meeting "to discuss his eligibility to travel with the school overseas," there was no mention of the charges against him, the violations under consideration, the nature of the allegations, or who made the allegations, only that a complaint had been filed. Jerome Broussard remained unaware of any facts necessary to give a statement regarding the charges of sexual assault, nor was he provided information regarding the reason for the meeting or whether he could bring evidence or a list of witnesses. The only directive stated in the March 21st email was that it would be regarding his ability to travel to Vienna for the summer semester with the law school.

50.  Defendants charged Jerome Broussard with violations of sexual assault before even speaking to him or obtaining his statement, and before giving Jerome Broussard an opportunity to present his own facts or witnesses.  This is in direct violation of the Title IX mandate and doesn't follow the basic scientific method of collecting all evidence before forming a hypothesis.

51.  Defendants interviewed and gathered statements from M.J. on multiple occasions prior to giving Jerome Broussard notice of the charge against him.

16

52.  Jerome Broussard was not called to the meeting until almost eight (8) months after the alleged incident, asking him to recall events with credibility much later than M.J.'s interview , therefore disadvantaging Jerome from defending himself.

53.  Jerome Broussard attended the meeting with Defendant Reed the next week, May 16, 2017, for a "Procedural Review."

54.  On or about May 16, 2017, Defendant Camaj and Defendant Reed met with Jerome Broussard  and a full ten (10) months after the alleged incident and took his statement. During the May 16th meeting, Jerome Broussard provided Defendant Reed with evidence, specifically text messages exchanged between Jerome Broussard and M.J. the day prior to and the day of the alleged incident. Jerome Broussard also explained that the investigating detective found no basis to M.J.'s criminal complaint and the D.A.'s office refused to pursue all allegations.

55.  On or about May 21, 2017, Jerome Broussard forwarded additional email messages from M.J. to Defendant Reed for his review. These contained long threats by M.J. being sent to all of Jerome Broussard's known email accounts, and were clear evidence of M.J.'s nature and malicious motive.  The emails from M.J. had time stamps for verification.

56.  Defendant Reed never sent Jerome Broussard a copy of M.J.'s statement for him to review.

Defendant Reed never sent Jerome Broussard a copy of his statement for him to review.

57.  On or about June 2, 2017,  Jerome Broussard finally received a letter informing him that he was being charged with violations of (i) Dating Violence, (ii) Sexual Assault, (iii) Sexual

Battery, and (iv) Stalking in violation of Loyola's Student Code of Conduct Policy (the "Policy").

58.   On or about June 2, 2017, Defendant Reed sent Jerome Broussard a letter stating he had until June 5th to either resign from the university with a "disciplinary" mark on his transcript or request a Board of Review hearing for the charges against him and listed (i) Dating Violence, (ii) Sexual Assault, (iii) Sexual Battery , and (iv) Stalking.

59.   Jerome Broussard consulted with several of his professors who informed him that if he resigned he would never be readmitted to any law school.

60.   On or about June 12, 2017, Jerome Broussard made various attempts to convince Defendant Camaj and Reed of his innocence, sending additional emails, text messages, screenshots, even allowing access to his Google location whereabouts for the dates that M.J. claimed that the rape occurred to substantiate his position and innocence. GPS coordinates also show that on the date that M.J. claimed to have been raped he was at his parents home, along with M.J. Jerome Broussard informed Defendant Reed and Camaj that his parents would testify to this fact that there was no time for the alleged rape to have occurred, to no avail.

61.   On or about June 23, 2017, Jerome Broussard met with Defendant Camaj for the "Due Process" meeting as entitled under the School Conduct Code and requested any / all evidence used against him, he is entitled. This request was denied and instead Jerome Broussard was provided a link to a "Dropbox" file through the email system on campus.  All material and /or possible evidence specifically related to M.J.'s complaint was denied.

The aforesaid email link to download the evidence being used against him was non-functioning thus Jerome Broussard was unable to download anything.  Jerome Broussard sent several emails to Defendant Camaj explaining this problem, yet never received any items or material listed in the file. Doe was forced defend himself without being provided any evidence against him to defend himself.

62.     On June 27, 2017, Jerome Broussard met with Defendant Camaj to discuss confidentiality breaches, namely M.J. publically alleging Jerome "raped her.", Jerome Broussard provided Defendant with a list of names who had confronted him about the "rape charge". Defendant Camaj defended M.J.'s actions, stating "it was not against the code to talk about something", which is in direct violation of the Students Rights provided to Jerome Broussard by the Office of Student Conduct which in part states that, "A student…….is entitled to procedural protections under the Code, including the right to receive reasonable protection from retaliation, intimidation, harassment or malicious prosecution."

63.     Defendants further violated the Code of Student Conduct against malicious prosecution. Jerome Broussard raised the likelihood M.J. maliciously created false testimony in order to have Jerome Broussard expelled from the university and presented evidence showing that M.J. was still pursuing Jerome Broussard up until the February phone call.  The Hearing Board refused to consider, any evidence submitted by Jerome Broussard.

.

64.     On June 29, 2017, Jerome arrived for the scheduled Hearing and was then informed by Defendant Camaj that M.J. would only be "present" by phone and he could not ask her any questions, that all of his statements must be directed at the panel.

65.     During the hearing there were several instances of evidence showing that M.J.'s testimony was not truthful, yet M.J.'s lies were ignored on the basis of relevance.

On or about July 17, 2017, Jerome Broussard received a letter stating that he was dismissed from the university, pending appeal, and that he could no longer attend classes after the appeal deadline of July 27, 2017.

70.     Jerome Broussard filed a timely appeal, which was submitted on Friday July 21, 2017, at or around approximately 15:30 hours, when the university would have been completely empty, yet curiously enough, Jerome Broussard received the answer to the appeal Saturday July 22, 2017, at approximately 10:30 a.m. stating his dismissal was effective July 22, 2017.

71.     Based on the aforesaid dates and times stated heretofore, Jerome Broussard's appeal was not be reviewed by the Board, in violation of Jerome Broussard's Due Process Rights.

72.     Additionally, the Dismissal letter contained additional charges not on the original letter, and added to the hearing docket after the hearing was complete, in further violation of Jerome Broussard's rights stated herein.

20

73.    Moreover, Defendants had accepted new information which was not disclosed to Jerome Broussard until <u>after</u> the Hearing began in direct violation of Jerome Broussard's Constitutional rights.

The Defendant's failed  to accurately apply the preponderance of the evidence standard in assessing the facts as presented, accepting as true the information communicated by M.J. in reaching its conclusion although obvious inconsistencies and contradictions exist while ignoring Jerome's evidence.

74.    Furthermore, in reaching the Decision, the Hearing Board improperly placed the burden of proof on Jerome Broussard, as the male accused of a sexual violation. Jerome Broussard entered the hearing being deemed "responsible," and he would have to clearly prove his innocence "beyond any reasonable doubt", in direct contradiction to the preponderance of evidence standard set forth under Title IX.

75.    Furthermore, the arbitrary and disproportionate severity of the sanctions as stated by the Hearing Board was unjustified and baseless.  At no time during the n seven (7) month investigation / adjudication of  the allegations was Jerome Broussard deemed a threat to others at the University, nor was an interim restriction and/or suspension assessed against him.

76.     The aforesaid Decision and Appeal Process was greatly influenced by the 2011 Dear Colleague Letter and pressures by the OCR related to Federal Funding, all in violation of

Jerome Broussard's guaranteed Constitutional Rights.

77.    On or about July 21, 2017, an appeal hearing was held (the "Appeal Hearing"). However, Jerome Broussard was not informed that an Appeal Hearing had taken place, who was on the

Appeals Hearing panel, or why Jerome Broussard's Appeal was rejected. On July 22, 2017, a letter from Defendant Camaj was sent to Jerome Broussard stating Jerome Broussard's appeal had been denied, confirming Defendants' original Decision. The July 22nd letter stated that Jerome Broussard had abused M.J. both sexually and physically, referencing the restraining order against him as the sole basis for the denial of appeal..

78.    Due to Defendant's actions with regard to all of the allegations and actions stated heretofore, Jerome Broussard has been diagnosed with Depression and Post Traumatic Stress Disorder. Jerome Broussard has attended counseling to address the anxiety and depression he has endured as a result of malicious and unsubstantiated allegations along with unfair, biased proceedings he faced between March 2017 and July 2017, the effects of which currently continue.

## COUNT I
### (42 U.S.C. § 1983: Denial of Fourteenth Amendment Due Process
### (Against Defendant Loyola)

79.    Jerome Broussard repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

80.    The Fourteenth Amendment to the United States Constitution provides that no state

shall "deprive any person of life, liberty, or property, without due process of law." In this case, Defendants are state actors subject to the Fourteenth Amendment.

81.    Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . .

82.    A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

83.    On April 4, 2011, the United States, by and through its agent the United States Department of Education, sent a 19-page "Dear Colleague" letter to colleges and universities all over the country, stating that "sexual violence" on campus was a form of "sexual harassment prohibited by Title IX.

84.    Reversing previous federal policy, the Dear Colleague Letter threatened colleges with hundreds of millions of dollars in de-funding penalties if they did not immediately begin investigating and adjudicating allegations of campus sexual assault under detailed procedures and terms dictated by the federal government.

85.    For example, and without limitation, as a result of the Dear Colleague Letter and later statements, actions, and directives issued by the United States, colleges were as of 2016:

(i)     Required to investigate and adjudicate campus sexual assault allegations regardless of whether the complainant reported his or her allegations to the police (whereas previous federal policy had permitted colleges to allow law enforcement to handle allegations of sexual assault);

(ii)    Required to establish a coordinated and centralized investigative and adjudicative procedure according to detailed rules mandated by the federal government and headed by a Title IX coordinator;

(iii)   Required to protect the anonymity of students accusing another student of sexual assault if the student making the allegations so requests;

(iv)    Required to apply a preponderance of the evidence standard when adjudicating such allegations (whereas previously colleges frequently applied higher evidentiary standards, such as the clear and convincing evidence standard);

(v)     Required not to allow cross-examination by the accused student;

(vi)    Required or strongly encouraged to expel students that the college finds to have engaged in nonconsensual sexual intercourse with another student.

86.     Since 2011, colleges and universities have consistently reaffirmed and adhered to the threat of substantial monetary penalties made in the Dear Colleague Letter. For example, in July 2014, former DOE Assistant Secretary for Civil Rights, Catherine Lhamon, stated that she would strip federal funding from any college found to be non-compliant with the requirements of the Dear Colleague Letter. "Do not think it's an empty threat," Lhamon warned.

87.     Upon information and belief, since 2011, Loyola has acted in response to the federal government's threat that colleges refusing to comply would be found in violation of Title IX and be subject to crippling monetary penalties. Therefore, Loyola has a pecuniary interest in the outcome of the adjudication of sexual assault complaints, because it could lose federal money

if it finds the respondent "Not Responsible." Loyola does not face the same risk of pecuniary loss if it finds the respondent "Responsible." Therefore, Loyola became a state actor by virtue of the federal government's coercion to comply with the Title IX investigative and adjudicatory process mandated by the 2011 Dear Colleague Letter and by subsequent federal actions, statements, and directives.

88.    The Dear Colleague Letter has resulted in significant action and legal consequences. Former Assistant Secretary for the Office for Civil Rights Catherine Lhamon recognized that: "Our release of the 2011 DCL is widely credited with having sparked significant changes at colleges and universities as they worked to meet Title IX's requirements consistent with the 2011 DCL."

89.    Speaking at a conference on campus sexual assault held at Dartmouth College in July 2014, Lhamon also stated that despite the fact it had never been done before, she was prepared to cut off federal funding to schools that violate Title IX .

90.    In fact, former Secretary Lhamon admitted: "It's nice when you carry the big stick of the federal government." Concerning why there is a higher volume of complaints being made to the OCR, Lhamon stated: "I think there is more public awareness about the issue and also more confidence from survivors that we will be there for them." **http://www.si.com/college-f**ootball/2016/10/20/title-ix-sexual-assault-explained

91.     On September 7, 2017 Department of Education Secretary Betsy DeVos vowed to replace the "failed system" of campus sexual assault enforcement, to ensure fairness for both victims and the accused. Ms. DeVos stated that "one person denied due process is one too many."

92.     The failure of educational institutions to provide fair and impartial policies and procedures led Ms. DeVos to declare that "the current approach isn't working. Moreover, Ms. DeVos stated, "It's no wonder so many call these proceedings "kangaroo courts. Washington's push to require schools to establish these quasi-legal structures to address sexual misconduct comes up short for far too many students."

93.     Significantly, Ms. DeVos proclaimed that the "era of 'rule by the letter' is over." The 2011 Dear Colleague Letter has failed students and their institutions. "Every student accused of sexual misconduct must know that guilt is not predetermined." Most importantly, "any school that uses a system biased toward finding a student responsible for sexual misconduct also commits discrimination."

94.     "Due process is the foundation of any system of justice that seeks a fair outcome. Due process either protects everyone, or it protects no one," Ms. DeVos stated.

95.     On September 22, 2017, the OCR withdrew the April 2011 Dear Colleague Letter and "Questions and Answers on Title IX and Sexual Violence," dated April 29, 2014.

96.     The OCR noted that the April 2011 Dear Colleague Letter placed "improper pressure upon universities" which resulted in the establishment of procedures for resolving

sexual misconduct allegations which "'lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and *are in no way required by Title*

*IX   or   regulation*.'"   *Id.*   (citation   omitted)   (emphasis   added). *See*

https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.

97.    On the same day, the OCR issued a significant guidance document that prohibits universities from relying on fixed rules or assumptions that favor complainants over respondents.

98.    The Guidance also requires that (i) a person free from actual or perceived conflicts of interest or biases lead sexual misconduct investigations; (ii) training materials or investigative techniques that "apply sex stereotypes or generalizations may violate Title IX.be avoided" to ensure a fair and impartial investigation; (iii) all rights and opportunities made available to complainants must be made available to respondents; (iv) "[d]ecision-making techniques or approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided" to ensure objective and impartial investigation; and (v) those issuing sanctions must consider the impact of separating a student from his or her education and the sanction should be proportionate to the violation. *See id.* However, on October 2, 2017, Loyola issued a statement to its students, staff, faculty, and administrators. In the statement, Tania Tetlow, Senior VP & Chief of Staff to the President, along with Defendant Smith, referred to the University's "concerns" regarding the DOE's "new guidance on campus sexual assault" and announced the University's commitment  to the original 2011 Dear Colleague Letter:

"As we talk about our work on campus, it's important to spend a moment reflecting on our collective concerns regarding the U.S. Department of Education's new guidance on campus sexual assault. As President Fitts made clear at Shifting the Paradigm, Loyola remains committed to our current Title IX policies and procedures. We are equally committed to the progress that we've made together as a result of our response to the 2011 Dear Colleague Letter, which addressed the issue of sexual assault on college campuses. As President Fitts said at Shifting the Paradigm, "This problem will never again be brushed under the rug. Eyes have been permanently opened, and there is nothing that will ever change that."

99.     Loyola's procedures for adjudicating sexual misconduct complaints is precisely the type of system referenced in DeVos' statement and in the September 22, 2017 Dear Colleague Letter.

100.     Accordingly, when Loyola investigated and adjudicated the sexual misconduct complaints against Jerome Broussard, and imposed a sanction of suspension on Jerome Broussard upon reaching its conclusions, Loyola was a state actor and was therefore required to honor the rights and guarantees set forth in the United States Constitution.

101.     In the course of such investigation and adjudication, Loyola violated Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment through its repeated acts of gender bias and of deprivation of the minimal requirements of procedural fairness.

102.     Defendant Loyola deprived Plaintiff of his liberty and property interests without affording him basic due process, including, but not limited to: his right to a fair adjudication; his right to be informed of the exact charges against him; his right to be heard by an impartial fact

28

finder; his right to question his accuser; his right to challenge the credibility of any adverse witnesses; and his right to present evidence and witnesses in support of his defense.

103.    In the course of said investigation and adjudication, Defendants flagrantly violated Jerome Broussard's clearly established rights under the Due Process Clause of the Fourteenth Amendment through their deprivation of the minimal requirements of procedural rights.

104.    As a result, Defendant Loyola failed to provide Plaintiff with basic  due process protections that they are required in violation of the 14th Amendment.

105.    As a result of these due process violations, Plaintiff continues to suffer ongoing harm, including damages to his reputation and other non-economic and economic damages.

106.    As a direct and proximate result of the above conduct, Plaintiff sustained damages, including without limitation, emotional distress, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

107.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, judicial interest and disbursements.

## COUNT II
### (Violation of Title IX of the Education Amendments of 1972 Against All Defendants)

108.    Jerome Broussard repeats and re-alleges each and every allegation hereinabove as if

fully set forth herein.

109.    Title IX of the Education Amendments of 1972 provides, in relevant part, that:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

110.    Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX of the Education Amendments of 1972 even though there is very little direct federal funding of school sports.

111.    Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a motivating factor in the decision to discipline. In either case, the statute is enforceable through an implied private right of action.

112.    The Obama Administration's DOE promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student . . . complaints alleging any action which would be prohibited by" Title IX or related egulations.

113.    The Obama Administration's DOE ostensibly recognized that the procedures adopted by a school such as Defendant Loyola covered by Title IX must accord due process to both parties involved, that a school has an obligation under Title IX to make sure that all

employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults."

114.    Defendant Loyola failed to conduct an adequate, reliable, and impartial investigation when it conducted its investigation and hearing into M.J.'s allegations, without Jerome Broussard's participation. The subsequent investigation and adjudication were further conducted in a manner depriving Jerome Broussard of adequate notice and material information necessary to meaningfully participate in the adjudication process.  Jerome Broussard was prevented from receiving evidence submitted against him or given the right to defend himself.

Furthermore, the Sanction imposed on Jerome Broussard was arbitrarily increased in severity, without explanation or rationale without a substantive basis.

115.   Upon information and belief, Defendants were pressured by activist groups that calling for harsher penalties for respondents in Title IX cases, creating increased scrutiny, undue pressure and influence resulting in the violation of  Jerome Broussard's Constitutional Rights.


116.   Upon information and belief, all students accused of alleged sexual misconduct and / or suspended / expelled from Loyola University for the same have been male.

117.As a direct and proximate result of the above conduct, Jerome Broussard sustained tremendous damages, including, without limitation, emotional distress, loss of education, career opportunities, economic injuries and other direct and consequential damages.

118.    As a result of the foregoing, Jerome Broussard is entitled to damages in an amount

to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and to an injunction enjoining violations of the Title IX in the process of investigating and adjudicating sexual misconduct complaints.

## COUNT III
### (State Law Breach of Contract against Defendant Loyola)

119.    Jerome Broussard repeats and re-alleges each and every allegation hereinabove as if

fully set forth herein.

120.   Defendant Loyola created express and/or implied contracts when Jerome Broussard accepted an offer of admission to Defendant Loyola and paid the tuition and fees.

121.     Defendant Loyola breached express and/or implied contracts with Jerome Broussard.

122.     Defendant Loyola's policies provide that students are to have a fair and impartial disciplinary process in which it is the responsibility of the University to show that a violation has occurred before any sanctions are imposed. Defendant Loyola breached its contract with Jerome Broussard when it failed to conduct a fair and impartial process, including not holding a hearing

123.    The U.S. Department of Education, and Office for Civil Rights requires that the preponderance of the evidence standard be used to evaluate allegations of sexual misconduct. Though an inadequate standard to protect the procedural rights of accused students Defendant Loyola violated this provision and failed to correctly administer the standard when

it improperly placed the burden of proof on Jerome Broussard to prove that the accusations

against him were not true and ignored Jerome Broussard's evidence .

124.    As a direct and proximate result of the above conduct, Jerome Broussard sustained

tremendous damages, including, without limitation, emotional distress, loss of educational and

career opportunities, economic injuries and other direct and consequential damages. Thus Jerome

is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest,

attorneys' fees, expenses, costs and disbursements.

125.    Specifically, Defendant Loyola University is accused of the following breaches:

**A.    Breach of the obligation to conduct an appropriate and unbiased investigation;**

126.    Loyola's sexual misconduct policy does not discuss or establish responsibility

of any employee or investigator, including the Title IX coordinator and of Student of Affairs.

127.    Despite the lack of any language regarding impartiality in Loyola's sexual

misconduct policy, fundamental fairness and the implied covenant of good faith require

Loyola University to conduct appropriate and unbiased investigations into all allegations

including sexual misconduct allegations, which Loyola failed to do.

128.    Loyola University Code of Conduct expressly states that investigations in

"Title IX cases and in compliance with federal guidelines, investigations and procedural

matters are to be completed within 60 days from the date of the initial report. This did not occur in this instance.

129.     In some instances, the Final Investigative Report indicates a particular occurrence is "fact" based merely on the allegation made by the complainant, yet the same standard was not applied in the case of the respondent.

130.     Loyola University breached the expressed and/or implied contract between Jerome Broussard and the university by not completing the investigation in the time frame that the Code of Conduct states.  This Code is written by Defendant Loyola, and was agreed to by Jerome Broussard when he was accepted and he paid tuition fees to the University.

**B.**     **Denial of meaningful right to counsel;**

131.     Loyola's sexual misconduct policy states that Jerome was entitled to a support advisor and / or the right to select an attorney or legal counsel as his support advisor.

132.     Loyola violated its own sexual misconduct policy, the promise of fundamental fairness, the implied covenant of good faith and fair dealing by denying Jerome the right to counsel throughout the investigation and disciplinary process.

133.     The Student Handbook provides that "The adviser for either party may confer privately with that party… but… may not speak on behalf of the complainant or respondent or otherwise participate in any meeting."

134.     The notion of a student being able to defend himself competently in a Due Process Matter replete with emotion is unrealistic, nor could Jerome have been expected to prepare and deliver his version of the facts in a coherent and logical manner. There is no substitute for effective legal counsel in a forum / venue with causal connection to Jerome Broussard's future livelihood.

**Breach of the obligation to provide Jerome with the specific charges against him;**

135.     Loyola University's sexual misconduct policy requires that notice be provided to students accused of sexual assault.

136.     The notice provided to Doe contained only information that a complaint had been filed with allegations of sexual misconduct.

137.     The notice provided by Loyola University was defective in that it did not fairly inform Doe  of all charges which he was facing.

138.     Loyola University's inadequate notice of charges against Doe was a breach of Doe's right to be provided with notice of the charges against him, as well as a breach of the University's promise of fundamental fairness and the implied covenant of good faith and fair dealing.

**Breach of obligation to provide competent, trained,  unbiased investigators, and decision makers;**

140.     Loyola's University's sexual misconduct policy is devoid of an obligation that decision makers act without bias, that the implied covenant of good faith and fair dealing and Loyola University's promise of fundamental fairness obligated Loyola University to provide Jerome with unbiased and trained investigators and decision makers are to ensure that the outcome of the investigation was not predetermined.

141.     Defandant Reed oversaw all aspects of the investigation into the allegations against Jerome and made the final decision regarding his sanction, and his / her bias conduct tainted the investigation from beginning to end.

142.     This bias is supported by Jerome stated discipline and the overall outcome of said Investigation by Loyola and their affiliates, this occurred despite the criminal investigator's determination M.J.'s allegations were baseless and the D.A. Office's refusal to prosecute Jerome on the same allegations. Loyola's choice to deliver the ultimate consequence, expulsion, was a product of an atmosphere replete with bias which permeated the entire disciplinary process.

143.     Upon information and belief, none of the investigators or decision makers involved in Doe's case had any training in adjudication, in the law of sexual assault, the weighing of evidence, the significance of forensic evidence, or in the relevance or irrelevance of particular evidence in the alleged sexual assault setting. Loyola University thus breached its guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing owed to Jerome Broussard.

### E. **Breach of obligation to afford Jerome an opportunity for confrontation and cross examination;**

144.     Loyola University's sexual misconduct policy does not provide for any sort of hearing for students accused of sexual misconduct. After an alleged investigation takes place, the decision of guilt or innocence and appropriate sanction(s) is left entirely up to the investigator assigned, or the Title IX coordinator, rather than a panel of decision makers.

145.    Jerome's right to confront his accuser and all evidence used by Loyola against him is a key component of fundamental fairness guaranteed to any accused.

146.     Jerome's right to confront Loyola University's evidence was extremely limited, as he was never permitted to review the statements of M.J., and Loyola ignored all evidence submitted by Jerome Broussard. He had no right to cross- examine M.J. or any other relevant parties, (which there were none).

### F. **Breach of obligation that there be sufficient evidence  (or any evidence) to support the Title IX Coordinator's finding.**

147.     Pursuant to Loyola University's sexual misconduct policy, the board could only find Jerome responsible for the alleged violation based on the information in the investigatory file and utilizing the preponderance of the evidence standard yet no meaningful investigation or weighing of evidence ever took place.

148.     Loyola University's promise of fundamental fairness and the implied covenant of good faith and fair dealing require that Jerome be presumed innocent and Loyola University

has the burden of proof. The records pertaining to Loyola University's investigation and ultimate decision demonstrate that Loyola University breached these obligations.

### G.      Breach of the obligation to provide a meaningful right of appeal.

149.     Pursuant to Loyola University's sexual misconduct policy, Jerome had the right to submit an appeal of the determination and any related sanctions. The presence of procedural errors, new information is evidence that does not support the determination, therefore the severity of the sanction imposed on Jerome was inappropriate.

150.     Upon information and belief, the Appellate Officers who considered Jerome's appeal did not have training in adjudication; in law; in the weighing of evidence; or in the relevance of irrelevance of evidence in the alleged sexual misconduct investigation setting.

151.      Despite the absence of any relevant training, the appellate officers were able to conclude that no procedural errors, evidence of bias, relevant new information, or excessive severity had impacted or would impact the ultimate outcome and sanctions in Jerome's case.

152.      Upon information and belief, the Appellate Officers for Sexual Misconduct are merely a rubber-stamp for the Conduct Board's decision.

153.     This "appeal" was illusory, not conducted in good faith and breached the promise of fundamental fairness and the implied covenant of good faith and fair dealing. Based on the facts no appeal was ever actually allowed.

### H. Summary

154.    All of the foregoing breaches of contract were wrongful, without justification or excuse, prejudicial, and were part of an effort to achieve a predetermined result in Jerome's case. Jerome was disciplined and constructively expelled from Loyola University despite not being guilty of any misconduct, sexual or otherwise. As a direct and foreseeable result of the said breaches of contract, Jerome has sustained, and will continue to sustain, substantial injury, including but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

## COUNT IV
### (State Law Estoppel and Reliance against Defendant Loyola)

155.    Jerome Broussard repeats and re-alleges each and every allegation hereinabove as if

fully set forth herein.

156.    Defendant Loyola's various policies constitute representations and promises and Defendant Loyola should have reasonably expected to induce action or forbearance by Jerome Broussard based on said policies and/or representations.

157.    Defendant Loyola expected or should have expected Jerome Broussard to accept its offer of admission, incur tuition and fees expenses, and choose not to attend other colleges based on its express and implied promises that Defendant Loyola would not tolerate, and Jerome Broussard would not suffer, harassment by fellow students, nor deny Jerome Broussard his procedural rights should he be accused of a violation of Loyola policies as guaranteed by the

University.

158.    As described above, the Sexual Assault Policies and Procedures, Student Handbook, and other official University publications constitute representations and promises that the University intended to induce reliance, action, or forbearance on the part of Jerome Broussard.

In reasonable reliance on these promises and representations, Jerome accepted the University's offer of admission and incurred tuition and other expenses based on the University's promise that it would abide by its implied and express promises, including guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing which Jerome reasonably relied upon as implicitly and / or explicitly stated by Loyola.

160.    Jerome Broussard reasonably believed that if he was found not guilty of the charges levied against him, he would not be sanctioned.

161.    Doe maintains the evidence proves that the sexual encounter at issue was entirely falsified out of malice and all contact between Jerome and M.J. was between consenting adults.

162.    Based on the foregoing, Defendant Loyola is liable to Jerome Broussard based *on estoppel.*

163.    As a direct and proximate result of the above conduct, Jerome Broussard sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and athletic opportunities.   As a direct and foreseeable result of the University's failure to honor its promises and representations, Jerome has sustained and will

continue to sustain substantial injury, damages, and losses. Jerome's damages, injuries and losses include, but are not limited to: injury to reputation, severe emotional distress, past economic loss, future economic loss, loss of future career opportunities, economic injuries , other direct and consequential damages, loss of educational and extracurricular opportunities, and deprivation of due process.

## COUNT V
## Negligent Infliction of Emotional Distress

167.    Jerome Broussard repeats and re-alleges each and every allegation herein above as if fully set forth herein.

168.    Loyola owed duties of care to Jerome Broussard, including without limitation, a duty of reasonable care in conducting the investigation of the allegations against him in a fair and impartial manner. Loyola breached this duty.

169.    Such breach by Loyola created an unreasonable risk of causing Jerome Broussard emotional distress in that Jerome Broussard's academic and disciplinary record is irrevocably and irreversibly damaged.

170.    Loyola University failed to perform the duty of care owed to Jerome. As a direct and proximate result of Defendant's actions, Jerome Broussard suffered actual harm in that he became depressed to the point of performance slipping at his employment.

171.    Plaintiff suffered emotional harm, in addition to other damages.

172.    Loyola was informed that M.J. had retaliated against Jerome Broussard by discussing witness statements with others and accusing Jerome Broussard of having "raped" her.

Despite the knowledge of M.J.'s actions, Loyola failed to protect Jerome Broussard's right to confidentiality and privacy to as great a degree as is legally possible, as afforded to Loyola students – including alleged offenders of misconduct - by its Policy. Instead, Defendant Camaj stated that M.J.'s actions were not necessarily retaliation and that "it was not against the code to talk about something." Defendant Camaj's response was in direct violation of the Students Rights provided to Jerome Broussard by the Office of Student Conduct which stated that, "A student charged with a violation of the Code of Student Conduct is entitled to procedural protections under the Code, including the right to receive reasonable protection from retaliation, intimidation, harassment or malicious prosecution."

173.    As a direct and foreseeable consequence of Loyola's actions, Jerome Broussard sustained tremendous damages, including, without limitation, severe emotional distress, loss of educational and career opportunities, economic injuries, and other direct and consequential damages.

174.    The emotional distress was severe enough that it has resulted in illness and/or mental harm to Jerome Broussard. As a result of Defendants' actions, Jerome Broussard was diagnosed with Depression and Post Traumatic Stress Disorder.

175.    Loyola's extreme and outrageous conduct was the cause of Jerome Broussard's distress.

176.     Considering that Jerome Broussard's entire academic and future employment

opportunities would suffer as a result of the adverse decision, Loyola should have recognized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or harm.

177.    Jerome Broussard's distress is reasonable in light of Loyola's conduct.

178.    As a direct and proximate result of the above conduct, Jerome Broussard sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational opportunities, economic injuries and other direct and consequential damages.

Jerome Broussard's suspension/expulsion from Loyola Law school for alleged sexual misconduct under Title IX effectively destroys Jerome Broussard's ability to finish his legal education anywhere as the bar across the United States require a degree from a law school accredited by the American Bar Association. Once a student is susupended/ expelled from one ABA accredited school like Loyola it is effectively impossible to be readmitted to any other ABA accredited school or to ever be allowed to take the bar examination in any jurisdiction in the United States

## COUNT VI GROSS NEGLIGENCE

179.    Jerome Broussard repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

43

180.    As set forth above, Loyola University has engaged in conduct that amounts to negligence.

181.    Loyola University's actions were taken with such disregard for the rights of Plaintiff that a conscious indifference to consequences is implied in law. Loyola University's actions evidence a conscious neglect of duty, a callous indifference to consequences, and such an entire want of care as would raise a presumption of a conscious indifferences to consequences.

182.    Loyola University has acted willfully, intentionally, and recklessly.

183.    Loyola University was reckless in that it was aware of, but consciously disregarded, a substantial and unjustifiable risk of injury or damage to Plaintiff. Loyola University's disregard of this risk was a gross deviation from the standard of care.

184.    Loyola University's gross negligence has caused Plaintiff, in fact and proximately, to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational and athletic opportunities; and loss of future career prospects.

## COUNT VII
## Violation of Title IX -Erroneous Outcome

185.    The erroneous outcome of the hearing and appeal can only be explained by

44

gender bias against males in cases involving allegations of sexual assault. This bias is reflected in the patterns of decision making by the University throughout the entire process.

186.     Moreover, upon information and belief, in all, or in virtually all, cases of campus sexual misconduct at Loyola, the accused student is male and the accusing student is female. The University has created an environment in which it is impossible for a male accused of sexual assault to receive the due process guaranteed by Title IX. This significant gender-based statistical disparity demonstrates the existence of discrimination. In fact, the University impermissibly presumes male students "guilty until proven innocent" based on invidious gender stereotypes.

187.     There are at least four causes for this discriminatory environment at the University. First, acquittal of an accused male student carries the threat that the Department of Education's Office for Civil Rights could institute an investigation that would result in the University's loss of federal funding. There could also be a civil suit filed by the female complainant, a type of suit that garners much more publicity than a suit by the accused and convicted male student.

188.     Second, the University officials in charge of or involved in the disciplinary process are not concerned about justice, individual rights, or their obligations to provide a fair and equitable procedure in accordance with due process guarantees; rather, they are concerned with what would be most expedient for them in their professional roles.

189.     Third, these officials also focus on what would be most expedient for the University and, in particular, avoiding publicity that could harm the University's image and brand, and hinder its efforts to attract tuition-paying students. The safer course for these officials is to convict all accused male students.

190.     Fourth, the University officials are susceptible to internal and external pressures, including efforts by those who wish to change the so-called "campus rape culture" at the expense of the individual rights of the accused male students. The University and its officials have plainly embraced this view, and the misandry it embodies. The resulting bias is obvious in the Sexual Assault Policies and Procedures.

191.     The University's concern is not a fair and equitable procedure in accordance with due process guarantees, but how the school will look to the outside world and the tuition-paying students that it hopes to attract.

192.     The facts of Jerome Broussard's case led him to experience gender bias and discriminatory environment.

193.     Jerome Broussard, based solely on his gender, suffered an erroneous outcome of the disciplinary process and the appeal. This unlawful discrimination by the University in violation of Title IX proximately caused  Jerome Broussard  to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects, all as described herein.

**COUNT VII Violation of Title** IX **- Deliberate**
**Indifference**

194.     Plaintiff incorporates the above paragraphs as if fully pled.

195.     On or before July 10, 2017,  Dean Alegro, Trustee Chair Robert **Savoie,** Nikolina Camaj, Robert Reed, and Alexandria Kelch-Brickner had actual notice of the University's misconduct relating to Jerome Broussard's disciplinary proceeding and the resulting affirmance on appeal.

196.    Despite this actual notice of the University's misconduct and the resulting harm to Jerome, each of these officials named in the preceding paragraph failed and refused to take any steps to correct the misconduct and resulting harm to Jerome Broussard even though they had the authority and obligation to institute corrective measures. This failure and refusal can only be explained by gender bias against males, as set forth above.

197.     Jerome Broussard, based solely on his gender, and the illegal and/or pressures placed on Loyola by the Government has suffered and continues to suffer the effects of the University officials' deliberate indifference. This unlawful discrimination by the University in violation of Title IX proximately caused Jerome to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

**PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, Jerome Broussard demands judgment against

Defendants as follows:

(i)     on the first cause of action for violation of constitutional due process under 42
        U.S.C. § 1983, a judgment against Defendants awarding Jerome Broussard
        damages in an amount to be determined at trial, including, without limitation,
        damages to physical well-being, emotional and psychological damages, damages
        to reputation, past and future economic losses, loss of educational opportunities,
        and loss of future career prospects, plus legal interest from the time of Judicial
        Demand until paid in full, attorneys' fees, expenses, costs and disbursements an
        injunction enjoining violations of the Fourteenth Amendment in the process of
        investigating and adjudicating sexual misconduct complaints;

(ii)    on the second cause of action for violation of Title IX of the Education
        Amendments of 1972, a judgment against Defendants awarding Jerome
        Broussard damages in an amount to be determined at trial, including, without
        limitation, damages to physical well-being, emotional and psychological
        damages, damages to reputation, past and future economic losses, loss of
        educational opportunities, and loss of future career prospects, plus legal interest
        from the time of Judicial Demand until paid in full , attorneys' fees, expenses,
        costs and disbursements and an injunction against and  to an injunction enjoining
        violations of the Title IX in the process of investigating and adjudicating sexual
        misconduct complaints;

(iii)   on the third cause of action for state law breach of contract, a judgment awarding
        Jerome Broussard damages in an amount to be determined at trial, including,
        without limitation, damages to physical well-being, emotional and psychological
        damages, damages to reputation, past and future economic losses, loss of
        educational opportunities, and loss of future career prospects, plus legal interest
        from the time of Judicial Demand until paid in full, attorneys' fees, expenses,
        costs and disbursements;

(iv)    on the fourth cause of action for state law breach estoppel and reliance, a
        judgment awarding Jerome Broussard damages in an amount to be determined
        at trial, including, without limitation, damages to physical well-being, emotional
        and psychological damages, damages to reputation, past and future economic

losses, loss of educational opportunities, and loss of future career prospects, plus legal interest from the time of Judicial Demand until paid in full, attorneys' fees, expenses, costs and disbursements;

(v)      on the fifth cause of action for state law negligent infliction of emotional distress, a judgment awarding Jerome Broussard damages in an amount to be determined at trial, including, without limitation, damages to physical wellbeing, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)      on the sixth cause of action for state law gross negligence, a judgment awarding Jerome Broussard damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus legal interest from the time of Judicial Demand until paid in full, attorneys' fees, expenses, costs and disbursements;

(vii)      on the seventh cause of action for violation of Title IX of the Education Amendments of 1972, Erroneous Outcome, a judgment awarding Jerome Broussard damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus legal interest from the time of Judicial Demand until paid in full, attorneys' fees, expenses, costs and disbursements;

(viii)      on the seventh cause of action for violation of Title IX of the Education Amendments of 1972, Deliberate Indifference, a judgment awarding Jerome Broussard damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus legal interest from the time of Judicial Demand until paid in full, attorneys' fees, expenses, costs and disbursements; awarding Jerome Broussard such other and further relief as the Court deems just, equitable and proper.

JURY DEMAND

Plaintiff demands a trial by jury of all issues presented herein that are capable of being tried by a jury.

Dated: July 20, 2018

Respectfully Submitted,

/s/Jeffery F. Speer

Jeffery F. Speer (#19398)
**Doucet-Speer, APLC**
617 St. John Street
Lafayette, Louisiana 70502
Ph: 337-232-0405
Fax: 337-237-3415

*Attorneys for Plaintiff Jerome Broussard*

50